**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MICHAEL EWAN, et al.,

    Plaintiffs,

      v.

ISLAMIC REPUBLIC OF IRAN,

    Defendant.

Civil Action No. 17-1628 (JDB)

## <u>MEMORANDUM OPINION</u>

Almost forty years ago, the terrorist organization Hezbollah attacked the U.S. Embassy in Beirut, Lebanon, killing over fifty people and leaving dozens of others injured. Plaintiffs Michael Ewan and David Seelye are two former U.S. Marines, who were stationed at the Embassy and injured as a result of the attack. They and five of Ewan's family members bring suit against the Islamic Republic of Iran for Iran's alleged material support of the Hezbollah terrorists who perpetrated the attacks. For the reasons explained herein, the Court finds Iran to be liable for plaintiffs' injuries and accordingly will award plaintiffs compensatory and punitive damages under the Foreign Sovereign Immunities Act ("FSIA").

## <u>Background</u>

The tragic events of 1983 have given rise to a series of lawsuits against Iran, which this Court has handled, and the Court assumes familiarity with the background facts as presented in its previous opinions. <u>See, e.g.</u>, <u>Estate of Doe v. Islamic Republic of Iran</u> ("<u>Doe I</u>"), 808 F. Supp. 2d 1, 7–10 (D.D.C. 2011); <u>Dammarell v. Islamic Republic of Iran</u> ("<u>Dammarell II</u>"), 404 F. Supp. 2d 261, 271 (D.D.C. 2005). The Court thus limits its rehearsal of the details to those facts most relevant to plaintiffs' present claims.

1

On April 18, 1983, a car bomb exploded at the U.S. Embassy in Beirut, Lebanon, killing at least fifty-two people and injuring more than thirty-four others.  Doe I, 808 F. Supp. 2d at 7.  "The bombing was the first large-scale attack against a United States Embassy anywhere in the world," and although responsibility for the bombing was not immediately apparent, the U.S. State Department determined by 1984 that the Lebanese Shi'a group Hezbollah had designed and executed the attack with the support and encouragement of Iran.  Dammarell v. Islamic Republic of Iran ("Dammarell I"), 281 F. Supp. 2d 105, 111–12 (D.D.C. 2003).  On January 19, 1984, President Reagan "designated Iran a state sponsor of terrorism" for sponsoring several terrorist attacks in Lebanon, including the April 18, 1983 bombing.  Id. at 113.  Then, on September 20, 1984, a second bomb exploded at the U.S. Embassy annex in East Beirut, killing at least eleven people and injuring over fifty other individuals.  Doe I, 808 F. Supp. 2d at 7.

Since that time, a number of plaintiffs have filed cases in this District on behalf of bombing victims and their families.  Relying on the "terrorism exception" in the FSIA, these plaintiffs have alleged that because Iran provided material support to Hezbollah in organizing and executing these attacks, Iran was thereby liable for compensatory and punitive damages.  In a series of prior rulings, this Court has agreed and awarded damages against Iran and its agents for wrongful death, loss of solatium, battery, intentional infliction of emotional distress, and other forms of economic damages arising out of the Beirut Embassy bombings.  See, e.g., Doe I, 808 F. Supp. 2d at 21–23; Dammarell I, 281 F. Supp. 2d at 192–99.

Plaintiffs here are two former Marines, Michael Ewan and David Seelye, who were stationed in Beirut at the time of the Embassy bombing, as well as five of Ewan's family members.  Compl. [ECF No. 1] ¶¶ 6–12.  Ewan was at the site of the explosion and watched as the Embassy was destroyed; he reports that "[t]o this day," he can remember the face of the terrorist bomber who drove

the car bomb to the gate.  Decl. of Michael Ewan ("M. Ewan Decl.") [ECF No. 27-4] ¶ 4.  In the

wake of the blast, Ewan helped in the rescue and cleanup efforts around the Embassy, witnessing the

carnage firsthand.  Id. ¶ 6.  Given his fluency in Arabic, he also communicated with local Lebanese

families about the death of their loved ones in the blast, an experience which he describes as

"absolutely devastating" and the source of "nightmares to this day."  Id. ¶ 7.  In the wake of the

attacks, Ewan has suffered from PTSD and reports persistent pain in his back from physical injuries

he suffered at the blast.  Id. ¶¶ 11–14.  Five of his family members—his mother, Victoria Ewan; the

estate of his father, Emmanuel Ewan; and his three siblings, Tannous Ewan, Maria Ewan Chlimon,

and Elie Ewan—all report a deterioration in their relationships after Michael's experience in Beirut.

See Aff. of Victoria Ewan [ECF No. 27-11] ¶¶ 4–13; Aff. of Maria Ewan Chlimon [ECF No. 27-15]

¶¶ 4–14; Aff. of Elie Ewan [ECF No. 27-17] ¶¶ 4–11; Aff. of Tannous Ewan [ECF No. 27-19] ¶¶ 5–

17.

     Seelye was "less than a half mile away" at the time of the Embassy bombing, but reports

instantly knowing that his friends and fellow Marines had been injured or killed in the blast.  Decl.

of David Seelye ("Seelye Decl.") [ECF No. 27-8] ¶ 4.  After the attack, he helped to clean up the site

and is still haunted by the gruesome images he saw during that process.  Supp. Decl. of David Seelye

("Seelye Supp. Decl.") [ECF No. 34-1] ¶¶ 3–4.  These experiences have left him with PTSD, and he

describes suffering from nightmares, general sleeplessness, and a breakdown in his relationships with

friends and family.  Seelye Decl. ¶¶ 6–9, 11–13.  He has also experienced hearing loss and wears

hearing aids, which he ties back to the injuries he suffered during the bombing.  Id. ¶ 10.

     Iran has never appeared in this action.  See Default [ECF No. 17] at 1.  Plaintiffs accordingly

moved for default judgment on October 1, 2019.  See Pls.' Mot. for Default J. [ECF Nos. 26, 27] at

1.  On November 13, 2019, the Court appointed Alan L. Balaran as Special Master for this case.

Order Appointing Special Master [ECF No. 32] at 1.  Mr. Balaran has now prepared two reports on which the Court will rely in assessing plaintiffs' damage awards.  See Report of Special Master re: Former Marine David Seelye ("Seelye Report") [ECF No. 34]; Report of Special Master re: Former Marine Michael Ewan ("Ewan Report") [ECF No. 35].

## Legal Standard

The FSIA, 28 U.S.C. §§ 1602–1611, provides the "sole basis for obtaining jurisdiction over a foreign state in our courts."  Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434 (1989).  While foreign states are presumptively immune from the jurisdiction of U.S. courts, see Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993); see also 28 U.S.C. § 1604, the FSIA provides for federal court jurisdiction over foreign entities under a limited set of exceptions.  Subject matter jurisdiction exists if the defendant's conduct falls within one of those specific statutory exceptions.  See 28 U.S.C. §§ 1330(a), 1604.  Conversely, "if no exception applies, the district court has no jurisdiction."  Odhiambo v. Republic of Kenya, 764 F.3d 31, 34 (D.C. Cir. 2014).  Plaintiffs invoking one of these exceptions must establish jurisdiction by a preponderance of the evidence.  See Gordon v. Office of the Architect of the Capitol, 750 F. Supp. 2d 82, 87 (D.D.C. 2010).

One such statutory exception, set forth in 28 U.S.C § 1605A, waives sovereign immunity in cases concerning a "state sponsor of terrorism."  That exception affords subject matter jurisdiction in cases where "money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act" when such actions are taken "by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency."  28 U.S.C. § 1605A(a)(1).

"Courts may exercise personal jurisdiction over a foreign state where the defendant is

properly served in accordance with 28 U.S.C. § 1608." Owens v. Republic of Sudan, 826 F. Supp. 2d 128, 148 (D.D.C. 2011); see also 28 U.S.C. § 1330(b). "Once jurisdiction has been established over plaintiffs' claims against all defendants, liability on those claims in a default judgment case is established by the same evidence if 'satisfactory to the Court.'" Owens, 826 F. Supp. 2d at 151 (quoting 28 U.S.C § 1608(e)). Satisfactory evidence includes sworn affidavits or declarations, prior judicial fact-findings, and other documents submitted in accordance with the Federal Rules of Evidence. See Bathiard v. Islamic Republic of Iran, Case No. 1:16-cv-1549 (CRC), 2019 WL 3412983, at *5 (D.D.C. July 29, 2019); Bodoff v. Islamic Republic of Iran, 424 F. Supp. 2d 74, 78 (D.D.C. 2006). "Section 1608(e) does not require a court to step into the shoes of the defaulting party and pursue every possible evidentiary challenge; only where the court relies upon evidence that is both clearly inadmissible and essential to the outcome has it abused its discretion." Owens v. Republic of Sudan, 864 F.3d 751, 785–86 (D.C. Cir. 2017).

## Analysis

### I.   Jurisdiction

The Court begins by considering whether plaintiffs have established subject matter jurisdiction over this dispute and personal jurisdiction over Iran. The Court must assure itself of its jurisdiction, even when plaintiffs move for entry of default judgment. See Jerez v. Republic of Cuba, 775 F.3d 419, 422 (D.C. Cir. 2014) ("A default judgment rendered in excess of a court's jurisdiction is void."); Mwani v. bin Laden, 417 F.3d 1, 6 (D.C. Cir. 2005) ("[A] court should satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant."). The Court concludes that plaintiffs have satisfactorily established both forms of jurisdiction.

Plaintiffs have demonstrated that the Court has subject matter jurisdiction over this lawsuit based on the "state sponsor of terrorism" exception set forth in § 1605A. In relevant part, the

exception covers cases seeking damages "for personal injury or death that was caused by . . . the provision of material support or resources" for "extrajudicial killing," if such aid was provided by "an official, employee, or agent of [a] foreign state while acting within the scope of his or her office." 28 U.S.C. § 1605A(a).   In order for the exception to apply, the foreign state must have been "designated as a state sponsor of terrorism at the time" of the terrorist attack or "so designated as a result of [the] act" and remain so designated at the time of the lawsuit or "within the 6-month period before the claim is filed."  Id. § 1605A(a)(2)(A)(i)(I).  The claimant or victim must also have been either a U.S. national, a member of the armed forces, or "otherwise an employee of the Government of the United States" or a government contractor, at the time of the tortious act.   Id. § 1605A(a)(2)(A)(ii).

Plaintiffs satisfy each of these requirements.  First, each plaintiff's claims are based, directly or indirectly, on the injuries sustained by Michael Ewan and David Seelye as a result of the 1983 Embassy bombing in Beirut, Lebanon.  The Court takes judicial notice of its prior findings of fact and conclusions of law set forth in its previous opinions determining that Iran provided "material support" to aid that bombing, which was an act of "extrajudicial killing."  See Doe I, 808 F. Supp. 2d at 14–16; Dammarell I, 281 F. Supp. 2d at 191–92.  Second, "[o]n January 19, 1984, President Reagan designated Iran as a state sponsor of terrorism . . . in response to Iran's role in sponsoring a number of terrorist acts in Lebanon," including the April 1983 bombings upon which plaintiffs base their suit.  Doe I, 808 F. Supp. 2d at 10.  Finally, plaintiffs satisfy the eligibility requirements of § 1605A(a)(2)(A)(ii) because, at the time of the attacks, Michael Ewan was "a member of the armed forces" and all other plaintiffs were U.S. nationals.  See Ewan Report at 5, 7–8, 11; Seelye Report at 3.

The Court also has personal jurisdiction over Iran.  "A foreign state or its political subdivision,

agency, or instrumentality must be served in accordance with 28 U.S.C. § 1608." Fed. R. Civ. P. 4(j)(1). Section 1608(a) sets forth four methods, in descending order of preference, for serving a foreign state, and plaintiffs must attempt service by each more preferred method, or conclude that such a method is impracticable, before proceeding to the next method. See Doe I, 808 F. Supp. 2d at 12. The first two methods do not apply in lawsuits against Iran because no "special arrangement for service" exists between the United States and Iran, 28 U.S.C. § 1608(a)(1), and Iran is not a party to any "international convention on service of judicial documents," id. § 1608(a)(2). Aceto v. Islamic Republic of Iran, No. CV 19-464 (BAH), 2020 WL 619925, at *14 (D.D.C. Feb. 7, 2020). Plaintiffs attempted to serve Iran "via DHL pursuant to 28 U.S.C. § 1608(a)(3) on August 31, 2017," but the service was returned "undelivered." Decl. in Supp. of Default [ECF No. 16] ¶ 3.

On October 4, 2017, plaintiffs requested that the Clerk of the Court effect service on the Iranian defendants under § 1608(a)(4) by transmitting the proper documents to the U.S. Department of State for diplomatic service. Letter Requesting Service [ECF No. 10] at 1. On May 3, 2018, the U.S. Department of State informed the Clerk of Court that service had been properly effected on the Iranian defendants on April 10, 2018. Return of Service [ECF No. 15] at 1. Iran never appeared in this proceeding, and plaintiffs moved for entry of default, see Decl. in Supp. of Default ¶¶ 7–9, which the Clerk entered on June 22, 2018, see Default at 1.

The Court thus has subject matter jurisdiction and personal jurisdiction under the FSIA, and now turns to the merits of plaintiffs' claims against Iran.

## II.    Iran's Liability for the 1983 Bombing of the U.S. Embassy in Beirut, Lebanon

Plaintiffs seek damages for economic loss and pain and suffering for two Marines injured during the Embassy bombing—Michael Ewan and David Seelye—and solatium damages for five members of Ewan's family. See Pls.' Mem. of Law with P. & A. in Supp. of Pls.' Mot. for Entry of

Default J. Against Def. Islamic Republic of Iran ("Pls.' Mem.") [ECF No. 27-1] at 2, 19–33; see also Compl. ¶¶ 38–52.  They bring this suit under the private cause of action in 28 U.S.C. § 1605A(c).  See Compl. ¶¶ 38–42.  Section 1605A(c) creates a cause of action "for personal injury or death caused by . . . a foreign state['s]" tortious acts and affords recovery for "economic damages, solatium, pain and suffering, and punitive damages."  28 U.S.C. § 1605A(c).  Courts in this District have also concluded that victims of terrorism can bring claims for intentional infliction of emotional distress under § 1605A(c).  See, e.g., Reed v. Islamic Republic of Iran, 845 F. Supp. 2d 204, 212 (D.D.C. 2012) ("An act that would otherwise constitute [intentional infliction of emotional distress] gives rise to liability under the FSIA.").[1]

"[L]iability in a default judgment case is established by the same evidence [used to establish jurisdiction] if [that evidence is] 'satisfactory to the Court.'" Doe I, 808 F. Supp. 2d at 17–18 (quoting 28 U.S.C. § 1608(e)).  The "satisfactory" evidence standard can be met through "uncontroverted factual allegations . . . supported by documentary and affidavit evidence."   Valore v. Islamic Republic of Iran, 700 F. Supp. 2d 52, 59 (D.D.C. 2010) (quotation and ellipsis omitted).  A court may also "take judicial notice of any fact 'not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned,'" including facts established in prior related proceedings and other court records.  Id. (quoting Fed. R. Evid. 201(b)).

Here, the Court has previously concluded that Iran is liable for the 1983 Embassy bombing

---

[1] The Court observes that plaintiffs are eligible to bring their action under § 1605A(c).  Cf. Maalouf v. Islamic Republic of Iran, Civil Action No. 16-0280 (JDB), 2020 WL 805726, at *6–7 (D.D.C. Feb. 18, 2020) (concluding that non-U.S. nationals who did not fit within § 1605A(c)'s other enumerated categories could not bring suit under the federal cause of action).  Michael Ewan was serving in the Marines at the time of the attack, see Ewan Report at 5, and the remaining plaintiffs were all U.S. nationals, see id. at 7–8, 11; Seelye Report at 3.  See also 28 U.S.C. § 1605A(c) (affording a private cause of action to "national[s] of the United States" and "member[s] of the armed forces").

in Beirut, see Doe I, 808 F. Supp. 2d at 23–24, and the same evidence that established Iran's liability in those previous cases will again serve as the basis for evaluating liability here.  In addition, the Court will rely on the two special master reports prepared by Alan Balaran based on plaintiffs' sworn statements and other documentary evidence.  See Ewan Report at 3–12; Seelye Report at 3–5; see also Amduso v. Republic of Sudan, 61 F. Supp. 3d 42, 46 (D.D.C. 2014) (adopting "all facts found by the special masters"), aff'd in part, vacated in part sub nom. Owens v. Republic of Sudan, 864 F.3d 751 (D.C. Cir. 2017).

Still, the FSIA does not provide the substantive basis for plaintiffs' claims.  See Estate of Hirshfeld v. Islamic Republic of Iran, 330 F. Supp. 3d 107, 137–38 (D.D.C. 2018).  A federal district court should not elaborate "federal common law," but must "rely on well-established principles of law, such as those found in Restatement (Second) of Torts and other leading treatises, as well as those principles that have been adopted by the majority of state jurisdictions to outline the boundaries of [plaintiffs'] theories of recovery."  Oveissi v. Islamic Republic of Iran ("Oveissi II"), 879 F. Supp. 2d 44, 54 (D.D.C. 2012) (internal quotation marks omitted).  The Court thus evaluates each of plaintiffs' claims under such "well-established principles of law."  Id.

First, Michael Ewan and David Seelye bring claims for economic loss and pain and suffering damages.  See Pls.' Mem. at 19–25.  Because acts of terrorism are "by their definition" extreme and outrageous conduct, the Court has previously determined that injuries to survivors of such acts are "compensable by analogy under the tort of intentional infliction of emotional distress."  Mwila v. Islamic Republic of Iran, 33 F. Supp. 3d 36, 40 (D.D.C. 2014) (internal quotation marks omitted), aff'd in part, question certified sub nom. Owens v. Republic of Sudan, 864 F.3d 751 (D.C. Cir. 2017). "Hence, those who survived the attack may recover damages for their pain and suffering . . . [and for] economic losses caused by their injuries."  Id. (quoting Oveissi II, 879 F. Supp. 2d at 55).  Here,

9

both Ewan and Seelye are surviving victims of the 1983 U.S. Embassy bombing and, accordingly, satisfy the elements of an intentional infliction of emotional distress claim.  See Ewan Report at 3–5, 18–19; Seelye Report at 3–5, 10; see also Opati v. Republic of Sudan, 60 F. Supp. 3d 68, 76 (D.D.C. 2014); Baker v. Sociality People's Libya Arab Jamahirya, 775 F. Supp. 2d 48, 74 (D.D.C. 2011) (allowing plaintiffs injured in a state-sponsored terrorist bombing to recover compensatory damages, including pain and suffering, under the tort of "intentional infliction of emotional distress"); Estate of Bland v. Islamic Republic of Iran, 831 F. Supp. 2d 150, 153 (D.D.C. 2011) (same).

Next, the Court turns to the claims brought by Michael Ewan's five family members for solatium damages resulting from Iran's intentional infliction of emotional distress.  See Pls.' Mem. at 25–33.  Under the Second Restatement of Torts, "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." Heiser v. Islamic Republic of Iran, 659 F. Supp. 2d 20, 26 (D.D.C. 2009) (quoting Restatement (Second) of Torts § 46(1)).  Recovery on an intentional infliction of emotional distress claim is generally limited by two further qualifications: "the plaintiff must be 'a member of [the injured person's] immediate family' and must be 'present at the time.'" Oveissi II, 879 F. Supp. 2d at 54 (quoting Restatement (Second) of Torts § 46(2)(a)–(b)).  In the case of terrorism, however, "[c]ourts have uniformly held that a terrorist attack—by its nature—is directed not only at the victims but also at the victims' families." Salazar v. Islamic Republic of Iran, 370 F. Supp. 2d 105, 115 n.12 (D.D.C. 2005); see also Republic of Sudan v. Owens, 194 A.3d 38, 44 (D.C. 2018) (concluding that, under D.C. law, "when § 1605A applies, the need for the presence requirement does not").  In other words, if plaintiffs establish that they are members of the injured victim's immediate family, they need not also satisfy the presence requirement.

Michael Ewan's five family members satisfy each of these elements.  First, as noted above, "[a]cts of terrorism 'by their very definition' amount to extreme and outrageous conduct," Wamai v. Republic of Sudan. 60 F. Supp. 3d 84, 90 (D.D.C. 2014) (quoting Valore, 700 F. Supp. 2d at 77), aff'd in part, vacated in part sub nom. Owens v. Republic of Sudan, 864 F.3d 751 (D.C. Cir. 2017), and the Court has previously concluded that Iran purposely aided in the perpetrating of these actions through its material support to Hezbollah, see Doe I, 808 F. Supp. 2d at 23–24.  Second, each of the five plaintiffs is a member of Michael's immediate family: Tannous Ewan, Maria Ewan Chlimon, and Elie Ewan are Michael's siblings, and Victoria Ewan and Emmanuel Ewan (whose estate is represented by Maria) are his parents.  See Murphy v. Islamic Republic of Iran, 740 F. Supp. 2d 51, 75 (D.D.C. 2010) (including one's spouse, parents, siblings, and children within "the strict meaning of immediate family" (internal quotation mark omitted)).  Finally, each of Michael's family members have suffered significantly from his psychological, emotional, and physical injuries.  See Ewan Report at 5–12, 26–28 (documenting "highly credible testimony that compellingly evidenced the close relationships Michael enjoyed with each [family member] before his deployment to Beirut, and the comfort and companionship they lacked upon his return").  The Court thus concludes that Iran is liable to all five of Michael's family members for solatium damages stemming from the severe injuries he suffered during the Embassy bombing.

### III.   Damages

A. Compensatory Damages

"To obtain damages against a non-immune foreign state under the FSIA, a plaintiff must prove that the consequences of the foreign state's conduct were 'reasonably certain (i.e., more likely than not) to occur, and must prove the amount of damages by a reasonable estimate consistent with this [Circuit]'s application of the American rule on damages.'"  Salazar, 370 F. Supp. 2d at 115–16

(some internal quotation marks omitted) (quoting <u>Hill v. Republic of Iraq</u>, 328 F.3d 680, 681 (D.C. Cir. 2003)).  Like the plaintiffs in <u>Wamai</u>, Michael Ewan and David Seelye have proven that the consequences of Iran's conduct were reasonably certain to—and indeed intended to—cause injury to members of the U.S. military stationed at the Embassy in Beirut.  <u>See</u> <u>Wamai</u>, 60 F. Supp. 3d at 89. They are thus entitled to "economic" and "pain and suffering" damages.  <u>See</u> 28 U.S.C. § 1605A(c). Ewan's immediate family members, in turn, are also "entitled to solatium damages" to compensate them for the anguish and suffering connected to the purposeful injury of their relative, Michael.  <u>See</u> <u>Wamai</u>, 60 F. Supp. 3d at 90.

### 1. Economic Damages

To begin, Michael Ewan and David Seelye both seek compensation for the economic losses arising from their injuries during the 1983 Embassy bombing.  In an action under § 1605A(c), "[t]he report of a forensic economist may provide a reasonable basis for determining the amount of economic damages."  <u>Reed</u>, 845 F. Supp. 2d at 214.  The Court must be mindful, however, of the "reasonableness and foundation of the assumptions relied upon by the expert."  <u>Roth v. Islamic Republic of Iran</u>, 78 F. Supp. 3d 379, 402 (D.D.C. 2015).

Both plaintiffs submitted reports prepared by the Center for Forensic Economic Studies.  <u>See</u> Ex. A. to Pls.' Mot. for Default J. ("Ewan Economic Report") [ECF No. 27-2]; Ex. B to Pls.' Mot. for Default J. ("Seelye Economic Report") [ECF No. 27-3].  Similar reports have previously been accepted by this Court and others in this District.  <u>See</u> <u>Wamai v. Republic of Sudan</u>, Civil Action No. 08-1349 (JDB), 2014 WL 12812056, at *2 (D.D.C. Feb. 14, 2014); <u>Estate of Botvin v. Islamic Republic of Iran</u>, 873 F. Supp. 2d 232, 243 (D.D.C. 2012).  In both reports, the Center assumed that Ewan and Seelye would have completed their required 20-year term of service in the military and begun their anticipated civilian employment (as a real estate sales agent and police officer,

respectively), and the Center then projected their life expectancy and lost earnings both in those careers and as members of their households.  See Ewan Economic Report at 3–8; Seelye Economic Report at 3–8.  The Center concluded that, if Ewan and Seelye had maximized their social security retirement benefits and retired at 67 years of age, then the total present value of their lost wages would be $2,419,982 for Ewan and $3,039,588 for Seelye.  See Ewan Economic Report at 9–10; Seelye Economic Report at 9–10.

The Court concludes that these awards are reasonable.  They are well within the range of damages awards in similar FSIA case, see, e.g., Wachsman v. Islamic Republic of Iran, 603 F. Supp. 2d 148, 161–62 (D.D.C. 2009) (awarding $3,040,289 in economic damages for lost income); Ben-Rafael v. Islamic Republic of Iran, 540 F. Supp. 2d 39, 59 (D.D.C. 2008) (awarding $3,731,839 for economic loss), and the Special Master independently assessed them and determined the Center's methodology "to be appropriate."  Ewan Report at 23; Seelye Report at 15.

### 2. Pain and Suffering Damages

Michael Ewan and David Seelye are also entitled to recover damages for pain and suffering caused by the bombing.  Ewan was at the scene of the attack, where he was "shocked and sick[ened]" at the sight of the devastation and the uncertainty of who among his friends had died.  Ewan Report at 4 (quoting M. Ewan Decl. ¶ 4).  He and other Marines "immediately began securing the area, gathering all body parts and human remains and placing them in body bags," and in the aftermath, he often had the duty of informing local family members of the deaths of their relatives.  Id. (quoting M. Ewan Decl. ¶¶ 6–7).  After being discharged seven months after the attack, Ewan suffered from post-traumatic stress disorder, which strained both his personal life and ability to work as a real estate agent.  Id. at 18–19; see also id. at 18 (noting that the Department of Veterans Affairs assessed Ewan to have a "70% service-connected disability for PTSD").  His physical injuries, however, are less

well documented; he provides no medical records to substantiate his claim of back injuries and hearing impairment as a result of the attack.  See id. at 20–21.

In light of this evidence, the special master concluded that Ewan should receive $2 million in damages for pain and suffering.  Id. at 21.  This determination falls close to the typical award of $1.5 million for servicemen suffering from psychological, but not physical, injuries, see Worley v. Islamic Republic of Iran, 177 F. Supp. 3d 283, 286 (D.D.C. 2016) (citing Peterson v. Islamic Republic of Iran ("Peterson II"), 515 F. Supp. 2d 25, 56 (D.D.C. 2007)), and thus represents a reasonable downward departure from the $5 million baseline for servicemen physically injured during the attacks, see Ewan Report at 21.  Accord Davis v. Islamic Republic of Iran, 882 F. Supp. 2d 7, 13–14 (D.D.C. 2012); Bland, 831 F. Supp. 2d at 155; Peterson II, 515 F. Supp. 2d at 55.  The Court adopts this recommendation, but with some modification.  Although the special master recommends awarding $2 million, presumably in recognition of the possible physical injuries to Ewan's back and hearing arising from the bombing, see Ewan Report at 5, 20–21, the Court concludes that the record evidence of physical injury is too weak to justify an award above that normally provided to surviving victims suffering only psychological trauma, see, e.g., Worley, 177 F. Supp. 3d at 286 (awarding $1.5 million to "those servicemen suffering psychological harm").  The Court thus will award Michael Ewan $1.5 million in damages for his pain and suffering.

As for David Seelye, the Court concludes that he too should be awarded pain and suffering damages.  Although not in the immediate vicinity of the bombing, he was less than half a mile away from the explosion, and upon hearing the blast, he rushed to the scene and saw the carnage firsthand. See Seelye Report at 3.  This experience left him with "a 70% service-connected disability rating for PTSD."  Id. at 5.  He suffers from nightmares, depression, anxiety, and flashbacks, especially at the sound of fireworks or gunfire, and he has received psychological counseling and takes medication to

cope with his anxiety.  Id.  He also claims to have suffered hearing loss due to tinnitus resulting from the bomb blast.  See Seelye Decl. ¶¶ 10, 15.

Based on a review of Seelye's statements, other documents, and similar cases, the special master determined that Seelye, too, is entitled to $2 million in damages for pain and suffering.  Seelye Report at 7–14.  Unlike Ewan's alleged injuries, Seelye's hearing loss is somewhat documented, but the special master notes "contradictory statements" across Seelye's various supporting statements and documents.  Id. at 11.  For instance, while Seelye's declaration attributes the hearing loss to the shockwaves from the bombing, see Seelye Decl. ¶ 10, he elsewhere omits mention of hearing loss, see Seelye Report at 12–13.  In his paperwork for the Center for Forensic Economic Studies, Seelye omits mention of his hearing loss as a factor in his exit from the military, citing instead the aftereffects of severe heatstroke and his PTSD.  Id. at 12.  As with Ewan, then, the special master concluded that Seelye's documentary evidence does not support a full award of $5 million for pain and suffering, but a reduced award of $2 million based largely on his psychological trauma.  Id. at 13–14.  Once again, the Court mostly agrees with the special master, but concludes that the normal award for a serviceman suffering from psychological injuries but not physical injuries (i.e., $1.5 million) is more appropriate.  Although Seelye complains of hearing loss and has hearing aids, see id. at 4 (citing Seelye Decl. ¶ 10), the record is not clear that his hearing loss stemmed from the Embassy bombing.  The Court therefore adopts the special master's recommendation with modification and will award Seelye $1.5 million in damages for his pain and suffering.

### 3.  Solatium Damages

Next, the Court turns to Ewan's family members' claims to solatium damages.  Damages for solatium "are by their very nature unquantifiable."  Moradi v. Islamic Republic of Iran, 77 F. Supp. 3d 57, 72 (D.D.C. 2015).  To bring some uniformity to these FSIA cases, however, the Court directed

the special master "[t]o assess and evaluate plaintiffs' damages claims . . . by this Court's prior decisions [and] by other relevant precedent."  Order Adopting Administrative Plan [ECF No. 31] at 5.  Courts in this District have established two primary frameworks, sometimes called the "Peterson II" or "Heiser" frameworks, for evaluating solatium damages for terrorist victims and their family members.  See Murphy, 740 F. Supp. 2d at 78–79.  Under both the Peterson II and Heiser frameworks, the standard damages awards for the immediate family members of a deceased victim are $5 million for parents and $2.5 million for siblings.  See Mwila, 33 F. Supp. 3d at 44–45 (citing Peterson II, 515 F. Supp. 2d at 51–53); Davis, 882 F. Supp. 2d at 14.  Those awards are typically halved for family members of an injured victim.  See Mwila, 33 F. Supp. 3d at 44–45.  But courts have also been mindful not to award family members a greater solatium award than the award received by individuals directly injured in the attacks.  See Estate of Brown v. Islamic Republic of Iran, 872 F. Supp. 2d 37, 42 (D.D.C. 2012).  In order to avoid such an outcome, courts in this District have reduced the family members' awards "in rough proportion" to the directly affected victims' awards. See Davis, 882 F. Supp. 2d at 15–16.

Here, the special master has recommended awards to Ewan's family members based off of the Heiser framework as adjusted for Ewan's pain and suffering award of $2 million.  Id. at 29–30. Under that framework, a victim's parents and siblings would normally receive $2.5 million and $1.25 million, respectively, but with the downward adjustment, the special master recommends an award of $1 million to Ewan's parents and $650,000 to each of his siblings.  See Ewan Report at 29–30.

The Court finds the special master's reasoning persuasive with certain modifications.  As the special master notes, "[e]ach member of Michael Ewan's immediate family has amply demonstrated an entitlement to an award for loss of solatium due to [his] injuries."  Ewan Report at 26.  All members of his family enjoyed a close relationship with him prior to the attack and report a

16

deterioration of those relationships since his return.  See id. at 26–28.  The Court agrees with the special master that Ewan's family members have demonstrated "a profound deprivation having lost, for all intents and purposes, 'the mutual benefit that each family member receives . . . including love, affection, care, attention, companionship, comfort, guidance and protection.'"  Id. at 28 (quoting Wilson v. City of Chicago, 758 F.3d 875, 883 (7th Cir. 2014)).  The Court also concurs with the special master that plaintiffs do not present "special circumstances warranting a deviation" from the standard awards framework.  Id.  Finally, the Court concludes that a downward variance "in rough proportion" to Michael Ewan's award is appropriate.  See Davis, 882 F. Supp. 2d at 15–16.  As noted above, however, Ewan is entitled to only $1.5 million for his psychological suffering due to the Embassy bombing, rather than the $2 million recommended by the special master.  Given this deviation from the special master's recommendation for Ewan, the Court also adjusts the recommendations for Ewan's family members.  Accordingly, and in line with other courts in this District, the Court will award $850,000 to each of Ewan's parents and $500,000 to each of his siblings in solatium damages.  See, e.g., O'Brien v. Islamic Republic of Iran, 853 F. Supp. 2d 44, 47 (D.D.C. 2012) (awarding $850,000 to the parents and $500,000 to the siblings of servicemen awarded $1.5 million for pain and suffering).

B.  Prejudgment Interest

Plaintiffs next seek prejudgment interest on their compensatory damages.  See Compl. at 12. "Whether to award such interest is a question that rests within this Court's discretion, subject to equitable considerations."  Oveissi II, 879 F. Supp. 2d at 58.  This Court and several others in this District have previously awarded prejudgment interest on similarly situated plaintiffs' awards, including pain and suffering and solatium. See Opati, 60 F. Supp. 3d at 82; see also Fritz v. Islamic Republic of Iran, 324 F. Supp. 3d 54, 63–64 (D.D.C. 2018) (concluding that prejudgment interest is

appropriate in the case of solatium damages for family members of U.S. soldiers who were abducted and murdered); Belkin v. Islamic Republic of Iran, 667 F. Supp. 2d 8, 24 (D.D.C. 2009) (similar); Pugh v. Socialist People's Libyan Arab Jamahiriya, 530 F. Supp. 2d 216, 263 (D.D.C. 2008) (similar).  Other courts have concluded that awards following the Heiser or Peterson II frameworks already "represent the appropriate level of compensation, regardless of the timing of the attack."  See Brown, 872 F. Supp. 2d at 45; Oveissi v. Islamic Republic of Iran ("Oveissi I"), 768 F. Supp. 2d 16, 30 n.12 (D.D.C. 2011); see also Oveissi II, 879 F. Supp. 2d at 59 (gathering cases wherein prejudgment interest was denied).

Despite these authorities to the contrary, the Court concludes that an award of prejudgment interest here is appropriate.  "Awards for pain and suffering and solatium are calculated without reference to the time elapsed since the attacks."  Khaliq v. Republic of Sudan, 33 F. Supp. 3d 29, 34 (D.D.C. 2014), aff'd in part, vacated in part sub nom. Owens v. Republic of Sudan, 864 F.3d 751 (D.C. Cir. 2017).  "A solatium award is therefore best viewed as fixed at the time of the loss," Fritz, 324 F. Supp. 3d at 64, and plaintiffs are entitled to the full amount of their award as if they received it at the time of the injury—in this case, on April 18, 1983.  Failure to do so would also allow the Iranian defendants "to profit from the use of the money over the last [four] decades."  Estate of Doe v. Islamic Republic of Iran ("Doe II"), 943 F. Supp. 2d 180, 184 n.1 (D.D.C. 2013).

In order to calculate the appropriate prejudgment interest, the Court will follow the method recommended by the D.C. Circuit in Forman v. Korean Air Lines Co., 84 F.3d 446 (D.C. Cir. 1996). "Although the prime rate, applied over a period of several years, can be measured in different ways, the D.C. Circuit has approved an award of prejudgment interest 'at the prime rate for each year between the accident and the entry of judgment.'"  Opati, 60 F. Supp. 3d at 83 (quoting Forman, 84 F.3d at 450).  Using the prime rates for each year since the 1983 Beirut embassy bombing through

June 2020 results in a multiplier of 10.62015, which the Court will apply to plaintiffs' pain and suffering and solatium damages[2] in calculating the total award.[3]   In sum, applying prejudgment interest to plaintiffs' awards of pain and suffering damages and solatium damages and then adding the damages for economic losses, the Court concludes that plaintiffs are entitled to $71,304,500 in total compensatory damages.

C. Punitive Damages

In addition to compensatory damages for their emotional distress, plaintiffs also seek punitive damages.  See Compl. ¶¶ 53–56.  Punitive damages "serve to punish and deter the actions for which they are awarded."  Valore, 700 F. Supp. 2d at 87.  The D.C. Circuit has previously concluded that "a plaintiff proceeding under either state or federal law cannot recover punitive damages for conduct occurring prior to the enactment of § 1605A [in 2008]," Owens, 864 F.3d at 818, but the Supreme Court just last month vacated that ruling, concluding "that punitive damages are permissible for federal claims" under § 1605A(c), Opati v. Republic of Sudan, 140 S. Ct. 1601, 1610 (2020).  As noted above, plaintiffs bring their claims under the federal cause of action in § 1605A(c) and, in light of the Supreme Court's holding in Opati, the Court concludes that plaintiffs are eligible for punitive damages against Iran.

Courts calculate the appropriate amount of punitive damages by weighing four factors:

---

[2] Because the two awards of economic damages already account for interest and plaintiffs' long-term earning potential, the Court does not apply this multiplier to those figures.

[3] More specifically, the Court calculated this multiplier using the Federal Reserve's data for the average annual prime rate in each year from 1983 to 2020.  See Bd. Of Governors of the Fed. Reserve Sys., Data Download Program, available at https://www.federalreserve.gov/datadownload/Choose.aspx?rel=H15 (last visited June 9, 2020).  To calculate the multiplier, the Court multiplied $1.00 by the prime rate in 1983 (10.79%); discounted that interest by the percentage of the year left from April 18, 1983, to December 31, 1983 (70.4%); and then added that amount to $1.00— yielding $1.07596.  Then, the Court took that amount and multiplied it by the prime rate in 1984 (12.04%) and added that amount to $1.07596, yielding $1.205506.  The Court continued this iterative process through June 10, 2020, resulting in a total multiplier of 10.62015.  See Opati, 60 F. Supp. 3d at 83 n.10.  For 2020, the Court estimated the rate to be 4.05167%—the average for the past six years—and again discounted the interest by the percentage of the year that has elapsed to date (44.2623%).  See id. at 83 n.11.

"(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." Oveissi II, 879 F. Supp. 2d at 56 (quoting Acosta v. Islamic Republic of Iran, 574 F. Supp. 2d 15, 30 (D.D.C. 2008)).  Here, all factors weigh in favor of awarding significant damages: Iran aided Hezbollah in carrying out a horrific attack that killed dozens and injured many more; plaintiffs suffered severe psychological trauma as a result; there is a significant need to deter further such terrorist attacks; and defendant is a sovereign nation that can be presumed to possess significant wealth.

Even given these factors, courts in this District have varied in how they award punitive damages.  In Doe, this Court awarded $300 million based on the determination that "Iran's material support to Hezbollah in the relevant time period was between $50 and $150 million . . . , and that an award of three times that amount is necessary to deter Iran from such conduct." Doe II, 943 F. Supp. 2d at 189–90.  Other courts have based awards of punitive damages on the underlying compensatory damages.  See Fritz, 324 F. Supp. 3d at 65 ("Recently, several decisions from this [District] have calculated the total compensatory damages awarded regarding a victim, and then multiplied that award 'by a factor between one and five.'").

This question becomes doubly complicated when trying to assess the proper award of punitive damages in a case subsequent to others that already imposed punitive damages for the same incident. See Murphy, 740 F. Supp. 2d at 81–82.  As this Court noted in Doe II, it must be cautious of imposing further punitive damages when they have previously been awarded not just by this Court, but also by others in this District.  See, e.g., Doe II, 943 F. Supp. 2d at 190; Wagner v. Islamic Republic of Iran, 172 F. Supp. 2d 128, 137–38 (D.D.C. 2001) (awarding $300 million against the Iranian Ministry of Information and Security for the 1984 U.S. Embassy bombing in Beirut); Brewer v. Islamic Republic

20

of Iran, 664 F. Supp. 2d 43, 46 (D.D.C. 2009) (awarding $300 million against various Iranian defendants for the 1984 bombing).  And because the present lawsuit involves seven plaintiffs, as opposed to the dozens involved in Doe and other larger cases, the Court is especially cautious not to double-up on the punitive damages.  See Doe II, 943 F. Supp 2d at 190 ("In a future case, . . . especially one with a small number of plaintiffs, an additional award of punitive damages might not be proper," because "if each of these plaintiffs brought his or her claims in a separate action, a separate award of $300 million in scores of cases arising out of the same conduct would clearly be over-punitive.").

On this question of subsequent punitive damages, the Court finds helpful Judge Lamberth's reasoning in Murphy, a case arising out of the 1983 bombing of the U.S. Marine barracks in Beirut. Faced with the "quandary" of whether he should award punitive damages in a subsequent lawsuit based on "the same incident" for which the court had previously awarded punitive damages, he used the ratio of the prior award of punitive damages relative to the prior award of compensatory damages "to gauge the amount of punishment and deterrence the Court considered necessary" in the prior case. Murphy, 740 F. Supp. 2d at 81–82.  Judge Lamberth observed that preserving that ratio across cases arising from the same incident would "comport with [the court's] conclusions made [in the prior case] as to the appropriate level of punishment and deterrence needed, while also ensuring that punitive damages are personal to plaintiffs in [the present] case." Id. at 82.

The Court finds this approach persuasive, for it balances the need to avoid unfairly imposing the same punishment repeatedly across multiple cases with the need to recognize the full scope of the damage caused by Iran's actions and to "anchor punitive damages to compensatory damages," which reflect the devastation wrought.  Cohen v. Islamic Republic of Iran, 268 F. Supp. 3d 19, 28 (D.D.C. 2017).  Turning, then, to Doe II, the Court awarded a total of approximately $8.41 billion,

of which $300 million was punitive damages.  See Doe II, 943 F. Supp. 2d at 184, 189–90.  That yields a ratio of $.03699 dollars of punitive damages for every dollar of compensatory damages awarded.  Applying that same ratio to the present compensatory damages, the Court concludes that it will award plaintiffs $2,637,000 in punitive damages to be distributed among the seven plaintiffs in rough proportion to their compensatory damages.[4]

D.  Attorney's Fees & Costs

Finally, plaintiffs briefly ask for "[a]n award of reasonable attorneys' fees" in their complaint.  Compl. at 13.  But the Court is not aware of any statutory or other basis for the award of attorney's fees under § 1605A(c), nor have "plaintiffs . . . provided any information regarding the fees and costs sought."  Aceto, 2020 WL 619925, at *23.  The Court will thus deny plaintiffs' request for attorney's fees and costs.

## Conclusion

For the foregoing reasons, the Court concludes that plaintiffs have demonstrated severe loss and hardship as a result of Iran's involvement in the 1983 U.S. Embassy bombing in Beirut, Lebanon.  The evidence in the record, combined with the Court's prior decisions, sufficiently supports the allegations in plaintiffs' complaint, and judgment will be entered for plaintiffs on their claims under § 1605A(c).  The Court will award compensatory damages totaling, with prejudgment interest,

---

[4] As in previous cases, the Court does not apply the prejudgment interest multiplier to the award of punitive damages because that award has been calculated based on the total award of compensatory damages, which already includes prejudgment interest where applicable.  In other words, the starting figure for the Court's punitive damages calculation—the sum of each plaintiff's compensatory damages—has already been adjusted to reflect present value, and no further adjustment need be made.  See Wamai, 60 F. Supp. 3d at 98 (not applying prejudgment interest to the award of punitive damages "as that is calculated here by reference to the entire compensatory award").

$71,304,500.   The Court will also award punitive damages of $2,637,000.   A separate order specifying each plaintiff's award will be issued on this date.

/s/
JOHN D. BATES
United States District Judge

Dated:   June 10, 2020